604 P.2d 123

**Kalvin Zeno KIEHNE, Plaintiff-Appellee,**

v.

**Robert A. ATWOOD,
Defendant-Appellant.**

**No. 12478.**

Supreme Court of New Mexico.

Dec. 5, 1979.

David L. Norvell, Albuquerque, for defendant-appellant.

Martin, Martin & Lutz, William L. Lutz, Las Cruces, for plaintiff-appellee.

OPINION

EASLEY, Justice.

Kalvin Zeno Kiehne, plaintiff-appellee, sued Robert A. Atwood, defendant-appellant, to invalidate the latter's election as Catron County Clerk. The trial court held Atwood's election invalid and declared Kiehne the winner. Atwood appeals. We affirm in part and reverse in part.

Since Atwood's winning margin was two votes, we could dispose of this cause by affirming the invalidation of any three of the votes. Normally this Court exercises judicial restraint by addressing only those issues the answers to which will conclude the dispute between the parties. However, numerous important questions of broad public interest involving election procedures are raised in this case. We decide each of these in order to more firmly establish the procedures for future elections. The issues are:

1. whether, at an election contest trial, a voter who has cast an illegal vote has a privilege to refuse to reveal for whom he voted;

2. whether there is substantial evidence to sustain the finding of the trial court that six of the voters were not residents of Catron County, thus voiding their ballots;

3. whether an absentee ballot is void when a voter claims in his application that he would be absent from the county because of his "duties, occupation, business or vacation," but had no intent or reason at the time of application to be gone from the county;

4. whether, if the voter finds himself in the county on election day after having cast an absentee ballot on the basis that he would be absent, his vote is to be considered as illegal;

5. whether absentee votes may be cast at the County Clerk's office at times other than regular office hours;

6. whether it is mandatory that the voter swear to and sign the affidavits on the application and the absentee ballot in the actual presence of the County Clerk before the Clerk can notarize the documents;

7. whether it is illegal for any person, other than the voter or the mailman, to deliver the completed ballot to the Clerk's office; and

8. whether, in the absence of any statutory provision regarding assistance to an absentee voter in marking his ballot, it voids the vote if the County Clerk, whose husband's name is on the ballot as a candidate for office, assists the voter.

In the November 7, 1978 general election, Atwood, the Democrat, received 684 votes, two more than Kiehne, the Republican, who received 682. Kiehne contested the election in the district court claiming that numerous illegal votes had been cast for Atwood. The matter was tried to the judge, who agreed with Kiehne and ruled that he has the legal right to the office. The specific findings and conclusions as to each point will be discussed in conjunction with that point in the order set forth above.

1. *Ballot Secrecy.*

At trial Atwood objected to voters stating for whom they voted in the Clerk's race on the grounds that it violated the principle of secrecy of the ballot. He asserted that only in a case of fraud could a voter be forced to disclose this fact. Thirty-seven voters testified, some of whom objected to identifying the person for whom they voted while others made no objection. The trial court ordered the objectors to disclose the information.

Kiehne claims that a person who votes illegally cannot invoke a privilege against revealing for whom he voted and contends that such privilege, in any event, would belong to the voter and subject only to his assertion, rather than being available to Atwood.

Article VII, Section 1, of the Constitution of New Mexico calls for enactment of laws to secure the secrecy and purity of elections. A multitude of statutes in the election code reinforce this significant mandate.

The sanctity of a New Mexican's ballot is undoubtedly one of his most cherished and jealously-guarded rights. It is

one of the fundamental civil liberties that form the bulwark against the erosion of a democratic government. Compromising the secrecy of the ballot is not to be tolerated except in cases of paramount public importance. In election contests two major public interests are often balanced against each other: the secrecy of the ballot versus the purity of elections. The choice between the two is not to be lightly made. The purity of elections is the public interest which sometimes outweighs the individual's right to have his ballot kept secret.

■ In *Carabajal v. Lucero*, 22 N.M. 30, 158 P. 1088 (1916), this Court considered whether voters may be compelled to testify about choices between candidates in an election and stated:

> [t]o permit the returns of an election, honestly and fairly conducted, to be overturned by the testimony of the voters is to destroy the safeguards thrown around the secrecy of the ballot, designed to procure an honest and free expression of the voter's choice without intimidation or coercion by any one.

*Id.* at 42, 158 P. at 1092–1093. Public policy requires that the veil of secrecy should be impenetrable, unless the voter himself voluntarily determines to lift it. *Hyde v. Bryan*, 24 N.M. 457, 462, 174 P. 419, 421 (1918).

However, this Court has faced this precise question and unequivocally decided that an illegal voter has no privilege against testifying as to the persons for whom he voted. *Montoya v. Ortiz*, 24 N.M. 616, 175 P. 335 (1918). As in the present case, the election contest there was over the choice of a county clerk. Ortiz, the Democratic candidate, was first thought to be the winner over Montoya, the Republican candidate. Montoya claimed that several persons had voted illegally. He called them to the stand and asked for whom they voted. The trial court did not consider this testimony, theorizing that it was not competent for an illegal voter to reveal these facts in court.

This Court, on appeal, ruled that the trial court had been led astray by *Carabajal, supra*, and that the case was not controlling for the reason that no question was raised in *Carabajal* regarding *illegal* votes. The same reliance on *Carabajal* by Atwood is misplaced. This Court in *Montoya* stated:

> [b]ut in the case of illegal voters *it is universally recognized* that the right to examine the voters in such a case is in affirmance and vindication of the essential principle of the elective system, that the will of the majority of the qualified voters shall determine the right to an elective office, and that the testimony of the voter, after it has been shown that he voted illegally, is competent, and should be received by the court or jury for what it is worth. (Citation omitted.) The law protecting the secrecy of the ballot is intended to apply only to lawful voters, and does not ordinarily apply to or protect illegal voters, who can be required to testify as to how they voted at an election. * * * Were the courts to close their doors to the reception of evidence as to how an illegal voter has voted, it would tend to promote fraud and encourage corruption. (Citation omitted.) * * It is held that neither the contestant nor the contestee is called upon to contend for the rights of a witness who does not demand protection, and, if the witness is compelled to testify, it does not follow that his testimony, which is competent without objection on his part, should not go to the court or jury for what it may be worth. (Citation omitted, emphasis added.)

*Id.* at 622–623, 175 P. at 337–338.

This principle is also enunciated in Rule 507, N.M.R. Evid. 507, N.M.S.A.1978, which states:

> [e]very person has a privilege to refuse to disclose the tenor of his vote at a political election conducted by secret ballot *unless the vote was cast illegally.* (Emphasis added.)

The case law of other states is overwhelming in holding that, although legal voters may not be compelled to disclose how they voted, illegal voters do not enjoy this same privilege. *Singletary v. Kelley*, 242 Cal.App.2d 611, 51 Cal.Rptr. 682 (1966);

*Sims v. Atwell*, 556 S.W.2d 929 (Ky.App. 1977); *McRobbie v. Registrars of Voters of Ipswich*, 322 Mass. 530, 78 N.E.2d 498 (1948); *Belcher v. Mayor of City of Ann Arbor*, 79 Mich.App. 387, 261 N.W.2d 56 (Ct.App.1977); *Wehrung v. Ideal School District No. 10*, 78 N.W.2d 68 (N.D.1956); *Oliphint v. Christy*, 157 Tex. 1, 299 S.W.2d 933 (1957); Annot., 90 A.L.R. 1362 (1934). Atwood has failed to produce any persuasive authority to the contrary.

In *Oliphint, supra,* the court reasoned that fraud could not be detected in an election conducted by voting machines if the illegal voter had the right to refuse to testify, and that the person voting could not be considered a "voter" since his illegal vote is a nullity. *Wehrung, supra,* holds that the privilege of secrecy is entirely a personal one, and the voter himself may waive this privilege. *Kaufmann v. La Crosse City Board of Canvassers,* 8 Wis.2d 182, 98 N.W.2d 422 (1959). We agree with these decisions.

■ However, there are peripheral legal principles that place some constraints on the procedures for purging illegal votes. *Montoya, supra,* recognized that the authorities maintain that an illegal voter cannot be required to testify if he claims his constitutional privilege against self-incrimination. *Sims, supra.* This is obviously good law, since voting when not qualified subjects the voter to criminal sanctions. § 1–20–22, N.M.S.A.1978. Of course, the burden is upon the party attacking a person's vote to prove that it is illegal. The presumption that a vote is legal must be overcome. *Berry v. Hull,* 6 N.M. 643, 30 P. 936 (1892).

■ Inherent in Atwood's arguments on appeal is the assumption that *he* had the right to invoke the secrecy privilege on behalf of the voters. This is patently erroneous. Maintaining the secrecy of one's ballot is a privilege personal to the voter. *Wehrung, supra ; Boardman v. Esteva,* 323 So.2d 259 (Fla.1975). The record shows that there are enough votes to change the results of the election that were cast by voters whose testimony convicts them of illegal voting and who did not claim their right against self-incrimination.

■ We hold that one who votes illegally forfeits the right of secrecy. The purity of the election demands that the illegal votes be purged. This prevents a manifest injustice. We cannot permit illegal voters to elect to office a person whom the *qualified* voters would not have elected. We affirm the decision of the district court on this issue.

2. *Residency for Voting Purposes.*

■ Six absentee ballots were invalidated by the court below for the reason that the voters were found to be non-residents of Catron County. Atwood challenges these findings of the trial court, claiming there was insufficient evidence to support them.

Under the terms of Article VII, Section 1 of the Constitution of New Mexico, a citizen must reside in the precinct, and the county, in which he offers to vote.

The New Mexico statutes are clear that the residence of a person is the place in which his habitation is fixed, and to which, whenever he is absent, he has the intention to return. § 1–1–7, N.M.S.A.1978. The statute establishes a two-prong test to determine residency: a change of residence is accomplished only by the act of moving to another place coupled with the intent to remain in the other place. A person does not lose his residence if he goes to another place for temporary purposes only and with the intention of returning.

The cases generally hold that the return must be anticipated at some reasonably definite or determinable time in the future. It does not mean an undefined or undefinable purpose to return to one's former residence. *Moore v. Tiller,* 409 S.W.2d 813 (Ky.1966).

With this unambiguous definition of "residence" before us, the task is to assess the trial testimony to determine if there is substantial evidence to show the non-residence of the voters in question.

It is undisputed that the six people whose votes were invalidated had removed them-

selves from the county; they all testified and were cross-examined. However, these voters were caught on the second prong of the residency test. At no place in the record is there a statement by any one of the six persons that they had any intention of returning to Catron County. All of them had permanent jobs in other counties of the state. Insofar as the record reflects, they all either intended to stay permanently in their new locations or, if they decided to move, intended to go to some place other than Catron County.

There is absolutely no doubt that these six people voted illegally in the election. The trial court was correct in deciding to purge their votes from the totals.

3. *Validity of Reasons For Voting Absentee.*

4. *Presence In the County on Election Day.*

The trial court found and concluded that twenty-one voters of absentee ballots "knew" at the time of making their application that they "would be present in Catron County on the day of the election, and were in fact present in Catron County" on that date.

This finding and conclusion has two pertinent parts: (1) the trial court implicitly found that none of these persons intended to be or thought they would be out of Catron County on election day on business or on vacation; and (2) significance was given to the fact that they were actually in the county when the election was held.

Section 1–6–3 of the New Mexico Absent Voter Act, §§ 1–6–1 *et seq.*, N.M.S.A.1978, provides that any qualified elector who "cannot be present" at his precinct poll on election day, "because of illness, injury or disability, or who will be absent from his county of residence because his duties, occupation, business or vacation requires him to be elsewhere, * * *" may vote by absentee ballot.

Myriad reasons, which drastically differ from those stated in their applications, were given at trial by the voters for voting absentee. Two voters testified that they knew they would be present in Catron County on election day and obtained absentee ballots for the reason that they did not like voting on the voting machines. Six testified that they were working in the mountains on election day and that they knew, when applying for the absentee ballots, that they would be present in Catron County on election day. One voter voted absentee because she did not know if her husband would take her to the polls and she did not want to go alone. Two voters testified that they planned to be present in Catron County on election day, but deliberately stated in their applications for absentee ballots that they would be away from the county on that day. As to nine other votes that were voided by the trial court, the evidence is plain that the persons making their applications for absentee ballots did not have the intention to be absent from the county on election day.

However, five of the voters whose votes were invalidated by the trial court testified, without contradiction, that they had thought they would probably be either out of state or out of the county on election day. One of these voters testified that his business often demanded that he be in Arizona. He stated that he could not predict or control when he would have to go to Arizona on business and therefore applied for an absentee ballot. Two of these voters testified that they applied to vote absentee because they had medical problems and could not predict whether they could make it to the polls. One of them stated that she had a doctor's appointment in Albuquerque scheduled for the day of the election when she applied to vote absentee, although it so happened that she did not keep her appointment.

The first question is whether a person who has no reason to think or believe that he or she will be out of the county for business or vacation on election day is qualified to vote absentee for either of those reasons. The answer is quite obvious from the statute. It permits absentee voting when a person "cannot" make it to the polls for those specific reasons. This clearly con-

templates that the person must have *some statutory reason.* If he has none, he is not a qualified absentee voter. The votes of those who testified that they had no known statutory reason for applying for or voting by an absentee ballot are void.

Under Section 1–6–4, the Secretary of State prescribes the form for the application for an absent voter ballot. The form used here has a box to be checked to indicate the reason a person is applying for an absentee ballot. The printed reasons from which a person chooses are identical with the statutory provisions. All voters involved here made check marks to indicate their reasons. There are elaborate procedures in the same section for insuring that the voter does not vote at the polls after having cast an absentee ballot.

Section 1–6–6 requires the Clerk to keep an "absentee ballot register" and deliver to each precinct board a list of all absentee ballot applicants or deliver a signature roster containing the same information to those precincts using voting machines.

Section 1–6–8, among other things, provides that the outer envelope of the absentee ballot shall contain a form to be executed under oath by the absentee voter which specifies that he will not vote "in this election other than by the enclosed ballot."

The finding that the voters knew that they would be present, and actually were present in the county on election day raises two issues: (1) whether it is necessary that an applicant actually *know* that he or she will be out of the county on election day before being eligible to vote by absentee ballot (the answer is obvious: there is no way that future absence from the county can be positively *known* in advance); and (2) whether the absentee vote is void if the voter is actually in the county on election day after having voted by absentee ballot.

There is little uniformity in the case law on these issues. Many of the differences are due both to the varied expressions in the statutes regarding absentee voter qualifications and to the degree of strictness with which the courts have construed the statutory language.

There are few general rules of statutory construction in this area. One of these is that absentee voting is considered a privilege granted the electors and is not an absolute right. *Sommerfeld v. Board of Canvassers,* 269 Wis. 299, 69 N.W.2d 235 (1955); Annot., 97 A.L.R.2d 257 (1964). Another question of importance is whether to apply a strict or liberal construction to our laws. On this issue there is a split of authority, with a preponderance of the cases taking a liberal approach in favor of the voter. 97 A.L.R.2d at 266, *supra.*

This Court in *Bryan v. Barnett,* 35 N.M. 207, 292 P. 611 (1930) placed New Mexico on the liberal side by deciding that absentee voters, although required by the statute then in effect to sign their applications for ballots, did not lose their votes, in the absence of fraud, because the applications were signed by a person other than the voter. This Court reasoned that the law favors the right to vote and seeks to give effect to the express will of the electorate. This Court there quoted *State ex rel. Read v. Crist,* 25 N.M. 1975, 179 P. 629 (1919), to the effect that only when the Legislature *expressly provides* that deviation from the prescribed procedure prevents the counting of the vote will the ballot be declared void. This Court held that the Legislature must make the procedures mandatory and stated:

> [t]hus it seems that this court has made it extremely plain that such regulations of electors and of voting are directory unless expressly made mandatory.

*Bryan* at 212, 292 P. at 613.

There is no provision in the present law which expressly voids an absentee ballot if the voter, after casting his absentee ballot, finds himself in the county on election day.

In *Bryan,* this Court equated absentee voting with regular attendance at the polls. It stated that the principle of absentee voting was adopted by our Legislature as our public policy and thus "the right became as sacred, as much to be protected and favored by the courts, as the right of voting by personal presence." *Id.* at 212, 292 P. at 613.

█ It is settled law in New Mexico that statutes should be construed to carry out the legislative intent. *Burroughs v. Board of Cty. Com'rs, Cty. of Bernalillo*, 88 N.M. 303, 540 P.2d 233 (1975).

█ The obvious intent of the absentee voting statutes, considering them in their entirety in conjunction with applicable related statutes in the election code, is to enlarge the right of franchise to people who fall into the categories specifically set forth in the law, provided they have good reason to believe that they cannot be available at the polls on election day. A person who expects to be gone from the county on business or vacation can never know with certainty that he will follow his plans, however well settled they may be. To hold that the application must be made with *certain* knowledge that the voter *cannot* be present would place unreasonable constraints upon the right to vote. This would be in contravention of the Legislature's manifest intent to enlarge the voter franchise.

We first take note that neither the statutes nor the application for an absentee ballot requires the voter to state details about his belief that he cannot get to the polls on election day. The application form only calls for a checking of a box indicating the appropriate statutory reason.

█ We determine the intent of the Legislature to be that a qualified absentee voter must in good faith have a reasonable belief that he may be unable to vote in person on election day for one or more of the specific statutory reasons and must sign the proper affidavits under oath to prove his status. After he has done this, it is the burden of the one challenging his right to vote to come forward and prove that the ballot is illegal, either when the votes are counted or by election contest.

Thus, the persons here who alleged statutory reasons for applying and voting, such as health and business, and whose testimony showed reasonable grounds to sustain their good faith in applying for and voting by absentee ballot, should have their votes counted. The trial court erred in voiding these votes.

█ The cases are in conflict on the other question that is raised as to whether an absentee ballot is void if the voter is not actually absent from the county on election day. Our statutes do not specifically void such a ballot. Furthermore, such a construction contradicts the Absent Voter Act as a whole. *Wood v. State*, 133 Tex. 110, 126 S.W.2d 4 (1939); *Longoria v. Lozano*, 485 S.W.2d 308 (Tex.Ct.App.1972).

At one time, the Texas law permitted absentee balloting in cases where the voter "expects to be absent." This law was amended to read: "who through the nature of his business *is absent*." (Emphasis added.) In *Wood v. State, supra*, the lower court ruled that under the later statute the absentee ballot would be illegal if the voter was not actually absent on election day. The Texas Supreme Court overruled that decision and held that it was a construction that contradicted the entire absentee voter law. This decision called attention to all of the various duties imposed upon the voter, the County Clerk and the election officials, by the Texas law. These duties began with the application and continued through the counting of the votes. The Texas Court stated that nowhere in the law was it ever hinted that actual presence in the county on election day would justify a refusal to count the vote. That Court found that election officers had an affirmative duty to count the ballot if it appeared from the papers before them that the voter had complied with the absentee voting statute. Our statutes should be construed in the same manner.

If his vote by absentee is void because of his inadvertent presence in the county on election day, how is the person going to exercise his right to vote? He could not vote in person at the polls. His precinct records would reflect that he had already voted. §§ 1–6–5 and 1–6–6. Furthermore, under the construction adopted by the trial court, he would be in the ludicrous position of having to needlessly absent himself from the county during the election to validate his absentee vote and to avoid the possibili-

ty of criminal prosecution for voting illegally. Unquestionably, the Legislature had no intentions of creating such an impasse. We hold that presence in the county on election day by an otherwise qualified absentee voter does not invalidate his vote.

5. *Weekend Voting.*

Three votes were invalidated by the trial court because the voters cast their absentee ballots in person at the County Clerk's office during the weekend when the office was normally closed.

■■■ The lower court found that Section 1–6–5(E), which states that "[a]bsentee ballots *may* be cast in person during the regular hours and days of business at the county clerk's office from 8:00 a. m. on the fortieth day preceding the election up until 5:00 p. m. on the Thursday immediately prior to the date of the election" is a mandatory provision (emphasis added). We disagree.

We have previously distinguished between mandatory and directory election provisions. *Telles v. Carter*, 57 N.M. 704, 262 P.2d 985 (1953); *Valdez v. Herrera*, 48 N.M. 45, 145 P.2d 864 (1944).

In *Valdez*, the votes from four precincts were ruled by the trial court to be void because the poll books were not delivered within twenty-four hours of the closing of the polls as required by the statute. This Court stated there that "the voter shall not be deprived of his rights as an elector either by fraud or the mistake of the election officers if it is possible to prevent it." *Id.* at 55, 145 P.2d at 870. Earlier in *Wright v. Closson, Mayor, et. al.*, 29 N.M. 546, 553, 224 P. 483, 485 (1924), this Court held that "the election will not be disturbed by reason of technical irregularities in the manner of conducting it or of making the returns thereof, especially in the absence of pleading and proof that the result was thereby changed or at least made uncertain." *See also Gallegos v. Miera*, 28 N.M. 565, 215 P. 968 (1923).

This Court has held that "[m]ere irregularities in the conduct of an election will not render an election void in the absence of a statute so providing, \* \* \*" *Orchard v.*

*Board of Com'rs of Sierra County*, 42 N.M. 172, 187, 76 P.2d 41, 51 (1938); *see Gallegos v. Miera, supra.* This Court in *Orchard* applied the principle to irregularities in canvassing the election returns. Other cases have found statutory provisions to be directory and not sufficient to cancel a voter's ballot. *Valdez, supra* (the ballots were not delivered to the County Clerk within the statutory period); *Bryan, supra* (the applications were not personally signed by the voter but by some other person); *Wright, supra* (an erroneous election proclamation); *Gallegos, supra* (a violation of the statutory provisions for wrapping and tying ballots, placing them in the box and sealing the box); and *State ex rel. Walker v. Bridges*, 27 N.M. 169, 199 P. 370 (1921) (procedures for the registration of voters).

■■■ No statutory provision specifies that an absentee ballot is void if it is voted by the voter in the County Clerk's office on a weekend rather than during regular office hours. No fraud was alleged or proved. We therefore hold that the taking of these ballots on the weekend by the County Clerk was a technical irregularity which did not threaten the purity of the electoral process. We hold that the trial court erred in invalidating these votes.

6. *Notarization of Absentee Ballots and Applications Outside of Voter's Presence.*

The County Clerk notarized either the application for an absentee ballot or the absentee ballot itself for seven voters who were not in her presence when they signed the documents. All of these voters testified that they had wanted the County Clerk, Atwood, to notarize their signatures although some had not expressed this wish to her. The trial court found that there was no fraud on the part of the County Clerk.

The statutes specifically require that the voter "shall" subscribe and swear to the affidavits on both the absentee ballot application and the ballot itself before a person authorized to administer oaths. §§ 1–6–4(D) and 1–6–9(A).

An "affidavit" has been defined as being a written statement, under oath, sworn to or affirmed by the person making it before some person who has authority to administer an oath or affirmation. *State v. Knight*, 219 Kan. 863, 549 P.2d 1397 (1976). It is distinctly different from an acknowledgement which is a method of authenticating an instrument by showing that the authenticating act was the act of the person executing it. *H.A.M.S. Co. v. Elec. Contractors of Alaska*, 563 P.2d 258 (Alaska 1977).

The execution of an affidavit necessarily demands the taking of an oath. The statutory language is in mandatory form. Although there is no specification in our statutes that a ballot not meeting the affidavit requirement will be considered void, a sworn affirmation of the truth of the statements in the two affidavits definitely enhances the integrity of the ballot. The affidavit on the application for a ballot requires the applicant to swear that he is a registered voter, that he will not be able to be present at his designated polling place, that he is qualified because of statutory grounds, that he is not a prisoner and that he has not been convicted of a felony. The affidavit attached to the ballot after it has been marked requires that the voter swear that he is a registered voter, that he will not vote in the election other than by the enclosed ballot, that he will not receive or offer compensation or reward for giving or withholding any vote, and that his address, precinct and party affiliation are correct.

This strikes close to the heart of the absentee voting process. The oath and the affidavit serve a salutary purpose by helping to insure that answers bearing on the qualifications of the voter are truthful; thus the oath and affidavit protect the integrity of the election.

In *Fugate v. Mayor and City Council of Town of Buffalo*, 348 P.2d 76 (Wyo.1959), the Wyoming Supreme Court, under similar circumstances, ruled that the absentee voter had no right to vote until he took an oath and signed the affidavit and that the voter had a duty to see that the affidavit was duly attested. This case involved affidavits on absentee ballots that were signed by the electors offering to vote but were not attested. On election day, a precinct official attested to twelve of the affidavits, but not in the presence of the affiants; seven of the affidavits were not attested to by anyone. The Wyoming Court held all of these votes illegal.

The Supreme Judicial Court of Massachusetts was faced with very similar facts to ours in *Desjourdy v. Board of Registrars of Voters*, 358 Mass. 664, 266 N.E.2d 672 (1971). The Massachusetts Court said that notarization outside the presence of the voter "results in more than simply a technical irregularity" since the statute "sets up significant safeguards to insure that the ballot represents the will of the voter." *Id.* at 671, 266 N.E.2d at 677. *Accord: Miller v. Hutchinson*, 150 Me. 279, 110 A.2d 577 (1954); *In re Application of Gould*, 81 N.J. Super. 579, 196 A.2d 278 (1963); *Owens v. Chaplin*, 228 N.C. 705, 47 S.E.2d 12 (1948); *Schmidt v. City of West Bend Board of Canvassers*, 18 Wis.2d 316, 118 N.W.2d 154 (1962).

We hold that, as to the affidavits in question, swearing to and subscribing by the voter and attesting to by a notary or other official are not mere technicalities. The statutes prescribing these duties are not simply directory. The acts called for are significant safeguards against fraud and mistake, are necessary to preserve the purity of our elections, and are mandatory duties. We affirm the decision of the district court in which seven ballots were voided for failure to abide by the oath and affidavit requirements.

7. *Delivery of Absentee Ballots by Third Person.*

The trial court voided the ballots of Mr. and Mrs. Natividad Sanchez because their ballots were not delivered personally to the County Clerk by the voters or by mail. They were taken to the Clerk's office by Clory Aragon who was advised by the County Clerk to mail the ballots, which he did. The trial court found that the possession of the ballots by Aragon invalidated

the Sanchez' votes. Although the trial court found that his possession was not intended to be for the purpose of influencing their votes, but rather was for the Sanchez' convenience, and that he had no knowledge of the alleged illegality of the act, the votes were still void.

Section 1–6–5 details the manner in which applications are to be processed, ballots are to be issued and voters are to cast their ballots in person in the Clerk's office. Subsection (F) states the manner in which the absentee ballots are to be mailed to people outside of the continental limits of the United States. Subsection (G) spells out the requirements for applicants domiciled inside the continental limits of the country. Subsection (H) provides as follows:

[n]o absentee ballot shall be delivered or mailed to any person other than the applicant for such a ballot.

It seems clear that within the context of this whole section subsection (H) is applicable to the delivery or mailing of ballots to potential voters *by the County Clerk.* Construing this subsection, as Atwood attempts to do, to cover delivery of the completed ballots *back to the Clerk* is not reasonable. This view is reinforced by the logical arrangement of the provisions of the statutes, thus:

Section 1–6–6: Absentee ballot register;
Section 1–6–7: Form of absentee ballot;
Section 1–6–8: Absentee ballot envelopes;
Section 1–6–9: Manner of voting;
Section 1–6–10: Receipt of absentee ballots by clerk.

Regarding the return of completed ballots by absentee voters, Section 1–6–9 states that "[v]oters shall either deliver or mail the official outer envelope to the county clerk of their county of residence." This section also covers overseas citizen voters and others voting from outside the state, and provides that they may deliver the ballots or mail them. No mandatory requirement of *personal* delivery of the completed ballots, as opposed to having a third party perform the task, can be read into this statute.

To require that only United States mailhandlers and the County Clerk can touch the completed ballot after it leaves the hands of the voter would be tantamount to disenfranchising all overseas voters since there would be persons other than the United States mailmen or County Clerk who would handle the documents. It is not a sensible proposition to hold that a legal voter who has properly completed his ballot and sealed it cannot have it delivered by his agent to the County Clerk's office.

In *Lanser v. Koconis,* 62 Wis.2d 86, 214 N.W.2d 425 (1974), an election was challenged because the City Clerk did not mail the absentee ballots to the electors or deliver them personally as provided by the statute. That Court held that the record did not indicate the slightest evidence of fraud, connivance or attempted undue influence and refused to invalidate the votes. That opinion quoted generously from *Sommerfeld v. Board of Canvassers, supra,* which dealt with the mailing of *completed ballots* by absentee voters, as here. The statute in *Sommerfeld* provided that the ballot be mailed "or if more convenient it may be delivered in person." The *Sommerfeld* Court held that the complaint as to the delivery of the ballots by an agent was purely technical, that delivery by the agent was substantial compliance with the spirit of the election laws, and that the statute was directory only.

We hold that delivery of the completed ballots by an agent of the voters to the County Clerk's office, standing alone, is not a sufficient deviation from the provisions of the absentee voter laws to void the votes in question. We reverse the trial court on this issue.

8. *Assistance of Absentee Voter.*

 Although there are elaborate provisions for giving assistance to a disabled voter who requests it at the polls on election day, § 1–12–15, N.M.S.A.1978, there was no hint in the law at the time of this election as to the proper way to assist a disabled absentee voter who was voting in

the County Clerk's office. The Legislature has since enacted a law to close this gap. § 1–6–5(E), N.M.S.A.1978 (Cum.Supp.1979).

In this case, Mrs. Atwood, the wife of the Democratic candidate, assisted a voter in casting her ballot. There is no claim or proof of any undue influence or other wrongdoing on the part of Mrs. Atwood, except that she simply helped the voter in casting her ballot. There was no violation of a statute. There is no other evidence of acts that were inimical to the purity of the election. We hold that the voiding of this ballot by the trial court was in error.

Having affirmed the district court on the invalidation of sufficient votes to change the election results, we remand the case to that court for the entry of a judgment confirming the election of Kiehne as Catron County Clerk.

IT IS SO ORDERED.

FEDERICI, J., and JOE H. GALVAN, District Judge, concur.